# PACE ENVIRONMENTAL LITIGATION CLINIC, INC.

ELISABETH HAUB SCHOOL OF LAW

78 NORTH BROADWAY

WHITE PLAINS, NEW YORK 10603

PHONE: 914.422.4343

FAX: 914.422.4437

SUPERVISING ATTORNEYS
KARL S. COPLAN
TODD D. OMMEN

ADMINISTRATOR
JENNIFER RUHLE

July 28, 2021

**Via ECF**
The Honorable Vernon S. Broderick
United States Courthouse
40 Foley Square
New York, NY 10007

Re:  Riverkeeper, Inc., et al. v. Pruitt, et al., No. 17-civ-4916 (VSB) (S.D.N.Y.)

Your Honor,

Plaintiffs in the above-referenced matter respectfully submit this letter to inform the Court of a recent decision relevant to the pending summary judgment motions and to respond to EPA's letter of May 20, 2021 (ECF No. 182).

Initially, attached to this letter is July 19, 2021 Memorandum Decision and Order from the Honorable David C. Nye, Chief Judge for the United States District Court for the District of Idaho in *Nw. Envt'l Advocs., et al. v. EPA* (Case No. 13-CV-00263) ("*NEA*"). In *NEA*, the court examined a very similar factual issue to the primary issue before this Court – EPA's ongoing failure to publish and promulgate water quality standards after disapproving of the state's standards. Although the case was decided under a different legal theory than at issue here (mandatory duty under the Clean Water Act), the reasoning in the case is nonetheless instructive. The *NEA* court found that EPA's years-long delay in promulgating standards was unjustified, especially in light of EPA's own June 3, 2019, memorandum regarding timing of promulgation under these very circumstances, *see id.* at 18-20, and the lack of support for EPA's claims of administrative burdens in developing such standards, *id.* at 22-24. To be sure, this analysis occurs in the context of whether EPA is under a mandatory duty to promulgate water quality standards, rather than whether EPA's delay in doing so could be considered "reasonable." But the reasoning applies well in the instant case, and several of EPA's justifications rejected by the court in *NEA* have been raised here as well.

It is in this light that Plaintiffs urge the Court to view EPA's May 20, 2021 letter (ECF No. 182). To date, EPA has had five years to develop and promulgate water quality standards. As briefed in Plaintiffs' motion for summary judgment, there is little evidence that, at least until very recently, EPA has taken any serious steps toward completing that work. EPA now asks for

July 28, 2021
Page 2 of 2

more than a full additional year to complete work that it states in its own policy memorandum should take ninety days. (*See* ECF No. 130-3 at 3). This most recent estimate would mean that six full years will have passed since EPA's initial disapproval of the state's water quality standards, and more than four full years will have passed since EPA's March 2018 "formal" disapproval. Plaintiffs respectfully submit that this further delay is unwarranted, inconsistent with the text of the Clean Water Act, and contrary and EPA's own stated positions as to the meaning of "promptly." (*See* ECF No. 129 at 13-20). Plaintiffs accordingly urge the Court to decide the pending motions for summary judgment and establish a date certain for EPA's publication and promulgation.

Respectfully submitted,

s/ Todd D. Ommen
Todd D. Ommen

cc: Counsel of record via ECF

Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, an Oregon Non-Profit Corporation; IDAHO CONSERVATION LEAGUE, an Idaho Non-Profit Corporation,<br><br>                        Plaintiffs,<br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>                        Defendant. | Case No. 1:13-cv-00263-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are the parties' cross-motions for partial summary judgment. Plaintiffs Northwest Environmental Advocates and Idaho Conservation League filed the first motion (Dkts. 85–86), and the United States Environmental Protection Agency ("the EPA") filed the other (Dkt. 87). Both sides assert that there are no disputes of material fact and that they are each entitled to judgment as a matter of law on Claim Six. On June 16, 2021, the Court held a hearing on the motions and took them under advisement. For the reasons set forth below, the Court GRANTS Plaintiffs' motion and DENIES the EPA's motion.

## II. BACKGROUND

### A. Procedural History

In 2013, Plaintiffs brought this lawsuit against the EPA, the United States Fish and Wildlife Service, and the National Marine Fisheries Service. Dkt. 1. Plaintiffs' Complaint alleged that the three federal agencies failed to take actions required under the Clean Water Act ("the CWA") and the Endangered Species Act pertaining to several water quality standards in Idaho. *See generally id.* In 2015, Plaintiffs reached a settlement agreement with the Fish and Wildlife Service and the National Marine Fisheries Service regarding the claims against those agencies. Accordingly, those agencies were dismissed from this case. Dkt. 37. That same year, the EPA moved to dismiss many of Plaintiffs' claims against it, which the parties fully briefed. *See* Dkts. 38–39, 43. In 2019, Judge Lodge issued an order granting in part and denying in part the EPA's Motion to Dismiss. Dkt. 56. This case was reassigned to the undersigned in late 2019. Dkt. 65.

Since that time, the parties have been focused on attempting to settle the remaining claims in the case. The parties represent that they have made significant progress toward reaching a final settlement of all the remaining claims in this case, with the exception of Claim Six—a claim pertaining to mercury water quality standards in Idaho. *See* Dkt. 83.

Plaintiffs brought Claim Six under the citizen-suit provision of the CWA, specifically Section 505(a)(2). *See* 33 U.S.C. § 1365(a)(2). They allege that the EPA has violated its duties under Section 303(c) of the CWA to promptly publish and promulgate mercury water quality standards after disapproving Idaho's revision of those standards. *See*

MEMORANDUM DECISION AND ORDER - 2

*id.* § 1313(c).

## B.  Section 303(c) of the CWA

To understand Plaintiffs' claim, a full reading of Section 303(c) is helpful. To summarize it, Section 303(c) of the CWA implements procedures for reviewing and revising water quality standards throughout the States. *Id.* It first requires each State to engage in a review of those standards every three years—what is known as triennial review—and to make the results available to the EPA. *Id.* § 1313(c)(1). Also, "[w]henever the State revises or adopts a new standard, such revised or new standard shall be submitted to the [EPA]." *Id.* § 1313(c)(2)(A). The EPA then must review the standard, either approving it within 60 days or disapproving it within 90 days. *Id.* § 1313(c)(3).

In the case of disapproval, the EPA must notify the State of the standard's aspects that are not consistent with the CWA and "specify the changes to meet such requirements." *Id.* "If such changes are not adopted by the State within ninety days after the date of notification, the [EPA] *shall promulgate such standard pursuant to paragraph (4)* of this subsection." *Id.* (emphasis added).

Paragraph (4) lays out the requirements for the EPA to promptly publish and promulgate a CWA-compliant water quality standard, unless the State exercises its last chance to adopt "a revised or new water quality standard which the [EPA] determines to be in accordance" with the CWA. *Id.* § 1313(c)(4). With the Court's emphasis, paragraph (4) states in full:

> (4) The [EPA] *shall promptly prepare and publish proposed regulations* setting forth a revised or new water quality standard for the navigable waters

involved—

> (A) if a revised or new water quality standard submitted by such State under paragraph (3) of this subsection for such waters is determined by the [EPA] not to be consistent with the applicable requirements of this chapter, or
>
> (B) in any case where the [EPA] determines that a revised or new standard is necessary to meet the requirements of this chapter.
>
> The [EPA] *shall promulgate any revised or new standard under this paragraph not later than ninety days after [it] publishes such proposed standards*, unless prior to such promulgation, such State has adopted a *revised or new water quality* standard which the [EPA] determines to be in accordance with this chapter.

*Id.*; *see also Idaho Conservation League, Inc. v. Russell*, 946 F.2d 717, 718 (9th Cir. 1991) (explaining Section 303(c)'s procedures and explaining that, if a state fails to adopt the EPA's proposed changes, "the EPA shall promptly prepare and publish federal regulations in lieu of the state regulations" (cleaned up)).

## C. Undisputed Material Facts

In the case at hand, the material facts related to Idaho's Section 303(c) revision of its mercury water quality standard are not in dispute. On June 25, 1996, the EPA approved Idaho's numeric freshwater aquatic life mercury criteria under Section 303(c) and determined that those criteria were in accordance with the CWA. Those criteria were 0.012 µg/L chronic and 2.1 µg/L acute.[1] Water quality criteria can be either numeric (*e.g.*, 0.012

---

[1] Numeric water quality criteria are often expressed in "µg/L"—micrograms per liter. Aquatic life water quality criteria are typically expressed in two forms: (1) acute criteria to protect against mortality or effects that may occur due to a short-term exposure to a chemical, and (2) chronic criteria to protect against mortality, growth and reproductive effects that may occur due to a longer-term exposure to a chemical.

µg/L) or narrative (*e.g.*, "Surface waters of the state shall be free from toxic substances in concentrations that impair designated beneficial uses"). Dkt. 87-1, at 3–4.

On August 4, 2004, the Idaho Department of Environmental Quality ("IDEQ") published a proposed rule for public comment to update some of the numeric criteria for toxic pollutants, including mercury. IDEQ proposed to remove the acute and chronic numeric freshwater aquatic life criteria for mercury and add a footnote "g" to the toxic criteria table to indicate that the narrative criteria for toxics would apply instead of the numeric criteria. After receiving comments on the proposed standards, including comments from the EPA, IDEQ submitted the proposal to the Idaho Board of Environmental Quality on November 18, 2004, which adopted the standards and submitted them to the Idaho Legislature in January 2005. The Idaho Legislature adopted the standards as final and made them effective on April 6, 2005. On August 8, 2005, IDEQ submitted the standards to the EPA for review and approval pursuant to its Section 303(c) requirement. *Id.* at 4.

On December 12, 2008, the EPA disapproved Idaho's deletion of the acute and chronic mercury criteria for aquatic life by way of a disapproval letter. Overall, the EPA concluded that "the removal of the acute and chronic numeric freshwater aquatic life criteria for mercury and replacement with footnote 'g' is inconsistent with [the CWA] Section 303(c) and 40 C.F.R. [§] 131.11." *Id.* Specifically, the EPA explained that IDEQ's implementation guidance for the mercury criteria did "not contain definitive information on how the State would translate the fish tissue criterion developed to protect human health to a value which can be used to protect aquatic life." Dkt. 86, at 16. The EPA identified

specific changes that would be needed for any future effort to adopt a new or revised mercury aquatic life standard to ensure compliance with the CWA. The EPA recommended four remedies to address the EPA's disapproval, stating:

> There are several options Idaho could consider in establishing mercury criteria that are based on scientifically defensible methods and protect Idaho's designated aquatic life uses including:
>
> 1) evaluate the protectiveness of EPA's current recommended 304(a) numeric acute freshwater aquatic life criterion for mercury (1.4 µg/l);
> 2) evaluate the protectiveness of Idaho's previous numeric chronic freshwater aquatic life criterion for mercury (0.012 µg/l);
> 3) evaluate development of Idaho-specific numeric acute and chronic freshwater aquatic life criteria for mercury; and
> 4) evaluate the use of a combination of protective numeric water column values and numeric wildlife criteria appropriate for Idaho species . . . .

*Id.* The EPA also suggested that "[u]ntil Idaho develops and adopts and EPA approves revisions to numeric acute and chronic aquatic life criteria for mercury," the criteria in effect would be the previously adopted acute (2.1 µg/l) and chronic (0.012 µg/l) criteria that the EPA approved in 1996. *Id.* at 10–11.

Neither the EPA nor Idaho has proposed or published revised aquatic life mercury criteria since the EPA's December 2008 disapproval letter. Now, Plaintiffs and the EPA each seek summary judgment on Claim Six, which is that the EPA violated its Section 303(c) duties to promptly publish and promulgate mercury water quality standards for Idaho. Dkts. 85, 87. Having heard oral argument and reviewed the parties' briefs on the issues involved, the matter is now ripe for the Court to issue its ruling.

## III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted).

Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Products., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

When cross-motions for summary judgment are filed, as is the case here, a court must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (cleaned up). In doing so, it must independently search the record for factual disputes. *Fair Hous.*

MEMORANDUM DECISION AND ORDER - 7

*Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where all parties essentially assert that there are no material factual disputes—does not end a court's responsibility to determine whether disputes as to material fact are present. *Id.*

## IV. DISCUSSION

Upon independent review of this case's record, the Court has determined that there is indeed no dispute of material fact present. Therefore, the matter at hand is purely a question of whether either side is entitled to judgment as a matter of law. The main issue presented is whether the EPA has violated and continues to violate its duties under Section 303(c)(3)–(4) of the CWA, particularly its duties to promptly publish and promulgate a CWA-compliant water quality standard for mercury in Idaho. *See* 33 U.S.C. § 1313(c)(3)–(4).

Plaintiffs contend that the EPA is in violation of those duties because (1) Idaho's change to the 1996 mercury standard was a revision, (2) the EPA's letter was a disapproval of that revision, (3) neither Idaho nor the EPA has adopted or promulgated a new or revised standard, and (4) the time elapsed since the EPA's disapproval is not prompt. Dkt. 86, at 12–17. The EPA contends that, under the circumstances of this case, it has no duty to adopt or promulgate a new standard or that duty is discretionary and cannot be a basis for litigation. Based on the undisputed facts in this case, Plaintiffs are correct.

### A. The EPA Has Failed to Perform Its Duties Under Section 303(c) of the CWA.

A step-by-step analysis of Section 303(c) and the undisputed events of this case

shows that the EPA has violated its duties to promptly publish and promulgate a water quality standard for mercury in Idaho. First, the Idaho legislature's change from the prior numeric criteria for mercury to the narrative criteria was a "revision" under Section 303(c)(2)(A), which triggered the EPA's duty to review Idaho's revised standard. *See* 33 U.S.C. § 1313(c)(2)(A) ("Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the [EPA]."). After all, the EPA itself referred to the change as a revision and engaged in the next step of the Section 303(c) process. *See* Dkt. 86, at 14.

Next, the EPA reviewed Idaho's revised mercury standard and disapproved it pursuant to Section 303(c)(3).[2] Again, when disapproval of a revised or new standard occurs, paragraph (3) requires the EPA to "notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the [EPA] shall promulgate such standard pursuant to paragraph (4) of this subsection." 33 U.S.C. § 1313(c)(3). The EPA's 2008 disapproval letter notified Idaho of the revised mercury standard's lack of compliance with the CWA and specified four potential changes to meet the CWA's requirements. To date, Idaho has not adopted any of those changes. Therefore, after the ninety-day period elapsed, the requirement arose that the EPA promulgate a CWA-compliant standard "pursuant to paragraph (4)." *Id.*

When this final step of this process under Section 303(c) is reached, paragraph (4)

---

[2] Idaho made its revision in 2005, and the EPA did not send its disapproval letter until 2008. Although the parties don't raise this issue, the Court notes that the EPA's disapproval was untimely because it was well beyond the 90-day timeframe provided in Section 303(c)(3). *See* 33 U.S.C. § 1313(c)(3).

dictates that the EPA "promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved" and "promulgate any revised or new standard under this paragraph no later than ninety days after [it] publishes such proposed standards." 33 U.S.C. § 1313(c)(4). Here, the problem for the EPA is that, to date, it has not complied with this step. For nearly 13 years since its disapproval of Idaho's revision, the EPA has neither published nor promulgated a water quality standard for mercury in Idaho. And, even if the EPA were to publish and promulgate a standard today, no argument can be made that doing so would be prompt. *See, e.g.*, *Nw. Envt'l Advocs. v. U.S. E.P.A.*, 269 F. Supp. 2d 1255, 1261 (D. Or. 2003) ("[O]ver three years have passed since EPA rejected Oregon's submission. Accordingly, EPA has failed to exercise its nondiscretionary duty under § 303(c)(4)(A)."); *Idaho Conservation League v. Browner*, 968 F. Supp. 546, 549 (W.D. Wash. 1997) (holding that the EPA "failed to perform its mandatory duty to promptly prepare and publish water quality standards for Idaho" as "a matter of law" when it had not done so two years and seven months after a disapproved revision); *Raymond Proffitt Found. v. U.S. E.P.A.*, 930 F. Supp. 1088, 1101 (E.D. Pa. 1996) ("[T]he court concludes that a nineteen-month delay in preparing and publishing proposed regulations is not fulfilling a public duty promptly").

Consequently, all the statutory conditions precedent under Section 303(c) are met. Given the EPA's inaction, the EPA has violated its duties under Section 303(c)(4) to promptly publish and promulgate a water quality standard for mercury in Idaho. Nevertheless, the EPA advances two defenses. The EPA first contends that, under the

circumstances of this case, it has no duty to do so. Dkt. 87-1, at 1. The EPA also argues that, even if it has such a duty, the duty is discretionary, thereby removing Claim Six from the realm of the CWA's citizen-suit provision (Section 505(a)(2)), placing the claim in the area of its sovereign immunity, and in turn ultimately warranting its dismissal. *Id.* at 1–2. Neither argument is persuasive.

### B. The EPA Has a Duty to Publish and Promulgate a Water Quality Standard for Mercury in Idaho Under These Circumstances.

The EPA first argues that it does not have a duty to publish and promulgate a water quality standard "when it disapproves a State's effort to weaken or remove standards that [the] EPA previously approved in accordance with" the CWA, referring here to the 1996 standard it approved. Dkt. 87-1, at 7. The EPA suggests that the "unless" clause found in the flush language of Section 303(c)(4) applies to this case, which in turn obviates the need for its action. The EPA then asserts that 40 C.F.R. § 131.21 is "[c]ritical to this interpretation" of the "unless" clause. Dkt. 87-1, at 7. The Court disagrees with the EPA's interpretation for several reasons.

### 1. Text

When interpreting a statutory provision, courts begin "where all such inquires must begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019). Here, by its own terms, the "unless" clause does not apply. Again, the flush language of Section 303(c)(4) reads in full, "The [EPA] shall promulgate any revised or new standard under this paragraph not later than ninety days after [it] publishes such proposed standards, *unless* prior to such promulgation, such State has adopted a *revised or*

MEMORANDUM DECISION AND ORDER - 11

*new water quality* standard which the [EPA] *determines* to be in accordance with this chapter. 33 U.S.C. § 1313(c)(4) (emphasis added). The key terms running contrary to the EPA's interpretation are "a revised or new water quality standard" and "determines." Note the present tense of the verb.

First, notably absent from this text is a statement that the EPA may merely do nothing and leave an old or existing standard in place. And nothing in the text speaks to the particular State's adoption of an "old" or "existing" standard as triggering the "unless" clause. To the contrary, the State must adopt "a revised or new water quality standard" to relieve the EPA of its burden. *See id.*

The second textual indicator that the EPA's interpretation is incorrect is Congress's use of the verb "determines" in the present tense, rather than determi*ned* in the past tense. The EPA's interpretation of Section 303(c)(4)—that is, that standards approved prior to the 303(c) process implicate the "unless" clause—overlooks this key distinction. "[T]he present tense generally does not include the past." *See Carr v. United States*, 560 U.S. 438, 448 (2010) (citing 1 U.S.C. § 1); *see also United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes"). Use of the present tense, in this context, demonstrates that Congress was providing a last chance for the State to adopt "a revised or new water quality standard" that the EPA could determine to be suitable at that time, not previously and especially not 25 years ago as they were here.

At the hearing, the EPA argued that the present tense use of the verb "determines" could merely mean that the condition of determining a standard is in accordance with the

CWA need only be met at some point. To illustrate its point, the EPA used an example in which an individual is told he or she can turn left in an intersection at a yellow light once the traffic *clears*, which the EPA suggested could mean that the person could still make that left turn if the traffic had previously cleared during the green light. The EPA then compared "clears" in its example to "determines" in the CWA. Though this example has some superficial appeal, it is ultimately unpersuasive when one reads the step-by-step process of Section 303(c) and considers the stated policies of the CWA: reviewing, updating, and making current the nation's water quality standards. Indeed, the "unless" clause applies only at the end of the Section 303(c) process and only to the EPA's duty to promulgate a new standard. *See* 33 U.S.C. § 1313(c)(4). Why would the EPA have to oversee this entire process and even "publish proposed regulations setting forth a revised or new water quality standard" only to not promulgate a standard and fall back on a standard it had previously approved? *See id.* A fairer reading of the CWA is the one the Court endorses today.

For these textual reasons alone, the CWA does not support the EPA's interpretation of the "unless" clause. It simply cannot be read to refer to old standards that the EPA determined were adequate and a State adopted prior to the Section 303(c) process.

### 2. Context and Policies

The EPA's interpretation of Section 303(c)(4)'s "unless" clause also neglects the context and explicit polices of the CWA. A holistic reading of Section 303(c) from start to finish demonstrates a focus on reviewing and revising water quality standards. It shows

MEMORANDUM DECISION AND ORDER - 13

that Congress was not, in this final stage, referring to old or existing standards in place at the time. Indeed, the EPA's review duty arises only after the State "revises or adopts a new standard" 33 U.S.C. § 1313(c)(2)(A), (3). And the EPA's duty to promptly publish and promulgate a CWA-compliant water quality standard arises only after (1) the EPA has notified the State that its new or revised standard is not consistent with the CWA specifying the changes to meet such requirements and (2) the State has not adopted those EPA changes within 90 days. At that point, the EPA must promptly publish and promulgate, unless the State, through its last chance, acts to comply with the EPA's suggestions. It defies the structure of Section 303(c) to suggest, as the EPA does now, that Congress mandated this entire process only to alleviate the EPA's burden to act at the final step because there once was an approved standard that has since been revised. To the contrary, the timing and steps of these statutorily required events demonstrate that the EPA cannot merely do nothing.

This reading comports with the explicit policies of reviewing and updating the "criteria for water quality accurately reflecting the latest scientific knowledge." *Id.* § 1314(a)(1). "[T]o hold otherwise would allow the agency's inaction to leave old standards or no standards in place, thereby defeating the CWA's purpose of restoring and maintaining 'the chemical, physical, and biological integrity of the Nation's waters.'" *Nw. Envt'l Advocs.*, 268 F. Supp 2d at 1261 (quoting 33 U.S.C. § 1251(a)). And the CWA was implemented to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(1), (2). "These

congressional goals simply cannot be satisfied when neither the EPA nor the state has promulgated a water quality standard that complies with federal law." *Raymond Proffitt*, 930 F. Supp. at 1097. When the States do not implement a standard, or implement a standard that will not achieve these purposes in compliance with the CWA, Section 303(c) requires the EPA to do so. *Id.* ("In this situation, Congress has stated that the Administrator—and nobody else—must promptly prepare and promulgate an acceptable water quality standard").

Although the EPA is correct that the CWA places primacy on state action, *see* 33 U.S.C. § 1251 ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . ."), such remains intact while still requiring the EPA to act in this scenario. The States review the standards on a triennial basis. The States revise those standards or adopt new ones. The States choose to adopt the EPA's suggestions when the EPA disapproves of their efforts. And the States—even at the last stage of the 303(c) process—control the fate of the standards. 33 U.S.C. § 1313. Regardless of the Court's interpretation, the process is replete with State primacy. *Nw. Envt'l Advocs.*, 268 F. Supp. 2d at 1260 ("This interpretation is consistent with the statutory scheme that vests primary authority for the promulgation of water quality standards in the states, but requires EPA's oversight"); *cf. Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1209–10 (9th Cir. 2019) ("An interpretation of § 1313 that provides states and the EPA with the opportunity to avoid their statutory obligations is incompatible with both the mechanics and purpose of the entire statute"). Indeed, the facts of this case evince State primacy. Idaho

carried the majority of the statutory weight, reviewing the mercury water quality standard, revising it, submitting it for review, and choosing not to adopt the EPA's suggestions or an alternative satisfactory standard. The CWA now requires the EPA to step in and to ensure CWA-compliant water standards are in place. *See Raymond Proffitt*, 930 F. Supp. at 1098 ("Once the EPA has disapproved the state standard, the ball is in the EPA's court. Nothing in the [CWA] authorizes the EPA to defer to the state or put off its obligation" to ensure a current standard is in place).

In short, the structure of Section 303(c), the context of the EPA's duties to promptly publish and promulgate a standard, and the explicit policies of the CWA cut against the EPA's interpretation.

### 3. 40 C.F.R. § 131.21

Given these points, the EPA falls back on 40 C.F.R. § 131.21 for support. The relevant regulation therein states, "A State or authorized Tribe's applicable water quality standard for purposes of the [CWA] remains the applicable standard until EPA *approves* a change, deletion, or addition to that water quality standard, *or until EPA promulgates a more stringent water quality standard*." 40 C.F.R. § 131.21 (emphasis added). This prompts the EPA to argue, "True, Idaho was attempting to revise—in fact remove—the 1996 [mercury] standards; however, that revision never took effect as a matter of federal law because [the] EPA did not approve it. . . . The 1996 Standards remained in effect the entire time because [the] EPA never approved new or revised standards." Dkt. 87-1, at 13–14 & n.5. The EPA, therefore, claims that it does not need to act because the 1996 standard

is still the existing standard.

But this regulation and the EPA's argument do not respond to the true question at hand. The question here is not whether there is an existing standard. Rather, the question is whether the statutory conditions precedent to the EPA's duties to promptly publish and promulgate a new or revised water quality standard occurred. The EPA implicitly acknowledges that its regulation is not on point because it suggests that *Chevron* deference does not apply to it. *See* Dkt. 87-1, at 5–6, 11–12. *See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (holding that reviewing courts must defer to an agency's interpretation of an ambiguous statute administered by the agency that carry the force of law). Although it may be true that the existing standard stays in place until the EPA carries out its duties to promptly publish and promulgate under paragraph (4) of Section 303(c), the EPA still must fulfill its statutory duties. As those conditions most certainly were met in this case, the EPA needed to act regardless of the 1996 standard.[3]

All that said, one could argue that interpreting the statute to require the EPA to promulgate a new standard when there is one existing would be an absurd requirement, which is to be avoided when interpreting statutes. *See McNeill v. United States*, 563 U.S. 816, 822 (2011); *Sturges v. Crowninshield*, 17 U.S. 122, 202–03 (1819) (stating that, to set aside the plain language of a statute based on the absurdity doctrine, the interpretation

---

[3] Arguments could be made regarding whether the EPA could merely re-publish and re-promulgate the same standards it previously had in place, but the CWA's plain terms require the EPA to, at bare minimum, publish and promulgate some CWA-compliant standard. However, answering this question is unnecessary, given that this case presents a situation of total inaction on the part of the EPA.

"must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application"). However, reviewing and updating water quality standards are precisely what the CWA aims to require. Thus, the Court's interpretation is far from absurd, especially given the existing standard's 25-year-old status in this case and the high bar to successfully convince a court of an absurdity argument.

In short, the cited regulation does not alter the Court's conclusion.

### 4. *Skidmore Deference*

The EPA then argues that its interpretation is entitled to *Skidmore* deference. Under *Skidmore v. Swift & Co.*, courts look to an agency's interpretation where it lacks the force of law, to the extent of "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." 323 U.S. 134, 140 (1944); *see also Sierra Club v. Trump*, 929 F.3d 670, 693 (9th Cir. 2019). The EPA's interpretation is not entitled to *Skidmore* deference for a few reasons.

The EPA's request for deference starts off on very rocky ground because, though it is arguably consistent with its stated position in the 2008 disapproval letter (more on this in a moment), its interpretations on this topic have been not only inconsistent with but flat out contrary to its position here. Most tellingly, the EPA's own memorandum diametrically opposes the interpretation the EPA advances in this case. *Policy for the EPA's Review and Action on CWA Program Submittals*, U.S. Envt'l Protection Agency (June 3, 2019),

https://www.epa.gov/sites/production/files/2019-

06/documents/policy_for_the_epas_review_and_action_on_cwa_program_submittals_0.

pdf [https://perma.cc/C69S-7GNQ]. The memorandum first explains that it applies to "all

CWA program submittals" and that its purpose is to ensure the EPA "reviews and formally

acts upon all state and tribal . . . [CWA] program submittals in accordance with the [EPA's]

statutory obligations and timelines." *Id.* at 1. Then, the memorandum recognizes that the

EPA has a history of being neglectful of its CWA duties, which precipitated this

memorandum:

> For many years, the EPA has routinely exceeded the review and action
> timelines established by Congress in the CWA. The EPA's disregard for its
> statutory deadlines has resulted in significant backlogs and lawsuits against
> the [EPA] for failing to comply with the [CWA] and has hindered states'
> abilities to implement and enforce authorized programs.
>
> . . . .
>
> Today's policy is intended to restore the rule of law, carry out Congressional
> intent, meet statutory obligations while fulfilling the [EPA's] mission, and
> require the [EPA] to be responsive to state and tribal partners.

*Id.* at 2–3. Lastly, the memorandum expresses the view that the EPA has a duty to promptly

publish and promulgate a federal water quality standard when the States do not, just as

what occurred in this case:

> [A]n EPA disapproval is likely to trigger the need for the [EPA] to
> promulgate a federal standard. In accordance with the case law principles
> described above, and consistent with other timelines for water quality
> standard review and action, . . . the EPA is expected to propose federal water
> quality standards promptly, without undue delay. Subject to this policy and
> to facilitate more effective program implementation and oversight, the EPA
> will interpret . . . promptly and without undue delay as requiring the proposal
> of federal standards within 90 days after a state or tribe fails to remedy a

> disapproval, and will finalize those standards within 90 days after proposal.
> . . . These timeframes should be more than adequate, as the information
> needed to correct the state and tribal submittals should be clearly articulated
> in the EPA's disapproval decisions.
>
> . . . .
>
> By incorporating a 90-day timeline to propose a federal water quality
> standard, the EPA will have a total of 270 days from the time it disapproves
> a state or tribal standard to the time it must issue a final federal standard.

*Id.* at 4 & n.4; *see also id.* at 5 (stating that the EPA "must take definitive action within the

deadlines established by Congress"). Hence, the EPA's own memorandum supports the

Court's interpretation.[4]

Similarly, the EPA previously summarized Section 303(c)(4) as working just the

way the Court holds today, stating: "Whether proceeding under section 303(c)(4)(A) or

(B), the [EPA] is to promulgate a final water quality standard not later than 90 days after

proposal, unless the State or authorized Tribe has *in the meantime* taken action that

addresses EPA's concern." *See, e.g.*, 64 Fed. Reg. 37072-01, 37074 (July 9, 1999)

(emphasis added). Clearly, by stating "in the meantime," the EPA read the "unless" clause

of Section 303(c)(4) as requiring the State to adopt the revised or new standard at that time,

not before. And, back to the 2008 disapproval letter, though it's true that the EPA stated

---

[4] At the hearing, the EPA claimed that this memorandum does not apply to the situation at hand and does not carry the force of law to obligate the EPA to act in accordance with it. The EPA repeated these arguments in a subsequent memorandum. Dkt. 101. But there is nothing in the memorandum to support the EPA's first claim. To the contrary, the memorandum is directly on point by its own language. The EPA does have a statutory duty to act, as it recognized in its June 2019 memorandum, and as the Court holds today. Although the EPA is correct that the memorandum does not compel the Court's holding, it is persuasive of how the EPA officially views the issues. The Court grants leave and accepts Plaintiffs' filed Sur-Reply. Dkt. 102. The Court agrees with many of the points made therein as reflected in this Order. In short, the EPA's arguments do not dissuade the Court from giving the memorandum the persuasive weight it deems appropriate.

the 1996 standard would remain the standard, the EPA did not state that it, therefore, did not need to carry out its statutory duties of promptly publishing and promulgating. As explained, that is a separate issue. Thus, consistency of pronouncements is not on the EPA's side here.

The EPA's thoroughness of supporting its position in its 2008 disapproval letter is suspect as well. Again, it did not include any citation or discussion as to why it would need not act. Instead, that rationale has arisen only now in litigation. The Ninth Circuit has rejected the notion of deferring to agencies' litigation positions interpreting statutes they are charged with administering. *See Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012); *see also Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 156 (1991). Therefore, the lack of pre-litigation thoroughness for its position is another strike against the EPA in its quest for *Skidmore* deference.

Another factor cutting against the EPA is that its interpretation does not "rest on the sort of expertise that might inspire deference." *See Sierra Club*, 929 F.3d at 694; *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (explaining that when an agency interprets its own regulation, its "interpretation must in some way implicate its substantive expertise" to be entitled to deference). Although the EPA indisputably has significant experience with the CWA and the science involved in regulating our nation's waters, it does not have more experience than an Article III court in interpreting a statute like Section 303(c), which is focused on process and procedures. Deciding procedural requirements is well within the federal judiciary's wheelhouse. Take a counterexample: if the EPA were seeking to guide

MEMORANDUM DECISION AND ORDER - 21

the Court in interpreting whether a specific promulgated mercury criteria met the requirements of the CWA, then the EPA's expertise would be well-suited to inform the Court because such a situation would implicate the EPA's scientific fact-finding or policy choices. However, obviously Section 303(c) does not deal with scientific standards and the type of expertise that might inspire deference to the EPA. In short, *Skidmore* deference is at its ebb in usefulness for interpreting Section 303(c).

Lastly, the Court does not view the EPA's reasoning as validly applied to the text, context, and policies of the CWA for the reasons already stated. For all these reasons, the Court will not afford the EPA *Skidmore* deference with respect to its interpretation of Section 303(c)(4) of the CWA.

### 5. *Administrative Burden*

As a last resort, the EPA turns to the parade of horribles that it speculates will ensue if the Court interprets the CWA in the manner it does today. The EPA suggests that the administrative burdens of the Court's interpretation will be too much to bear, causing problems throughout the country. Specifically, the EPA raises the concern of how burdensome it would be to deal with a State-proposed standard during the 90-day window it has to promulgate a federal standard, if one were proposed at that time. At the hearing, the EPA also suggested that adopting the reading of the CWA that the Court does today would not allow the EPA to review a State-submitted water quality standard the day before the 90-day window closes and would only allow the EPA to review one submitted during the 90-day window.

MEMORANDUM DECISION AND ORDER - 22

But the second concern is not at all the outcome of the Court's holding or what the CWA requires. Rather, the CWA allows the EPA to assess a State-submitted standard during the entire Section 303(c) process, not merely the 90-day window the EPA has to promulgate. Thus, that worry is unfounded. Plus, the EPA's worries seems to be derived from litigation strategy rather than a sincere institutional concern because, in its June 3, 2019 memorandum, the EPA itself did not view the timeframes as overly worrisome, stating:

> While the timeframes established by Congress are short, in most circumstances *the Regional water programs should have sufficient information to meet those deadlines if the disapproval process is implemented correctly*. For example, if a state's water quality standard is not based on sound science, the EPA should have relied on sound science to support a disapproval decision and therefore *should be able to develop a revised federal standard expeditiously*.

> If the Regional water program plans to issue a disapproval and cannot meet applicable statutory deadlines for federal action triggered by that disapproval, the Regional Administrator must work with the Office of General Counsel and the Assistant Administrator for Water to develop a strategy to address that legal risk and to ensure that the Region is doing all it can to satisfy the requirements of the CWA.

U.S. Envt'l Protection Agency, *supra*, at 4 (emphasis added).

What's more, these concerns do not have adequate support to overcome the analysis above. The law is what it is. If it leads to poor policy, that is for Congress to correct. Additionally, the burdens of which the EPA complains seem to be ones that Congress intended to impose on it. That is to say, Congress meant for the EPA to oversee the review and update process of water quality standards and to promulgate federal standards when the States could not or would not do so. Lastly, the Court is doubtful that the EPA's

concerns will be borne out.[5] Therefore, the EPA's parade-of-horribles argument is ultimately unpersuasive.

### 6. Conclusion

Simply put, absent action from Idaho in this scenario, the CWA requires action on the part of EPA. That action is for it to promptly publish and promulgate a new or revised water quality standard. The plain language of the CWA, its structure, its context, its explicit policies, the caselaw, and the EPA's own memorandum reject the EPA's interpretation. This Court does also.

## C. The EPA's Duty to Promptly Publish and Promulgate a New Standard Under Section 303(c)(4), Absent Relevant Action from a State, Is Nondiscretionary.

The EPA next argues that the statutory duties are discretionary because, if so, it is entitled to sovereign immunity from this lawsuit since Congress's waiver thereof, through the citizen-suit provision of the CWA, would not apply. The Court disagrees. In short, the duties are nondiscretionary, and therefore the EPA is not immune from this lawsuit.

The United States and its agencies are immune from suit by virtue of their sovereign immunity except for when Congress legislates in a manner to consent to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The CWA's citizen-suit provision—Section 505(a)(2)—is a situation in which sovereign immunity has been waived. That provision provides, in pertinent part, that "any citizen may commence a civil action . . . against the Administrator [of the EPA] where there is an alleged failure of the Administrator *to*

---

[5] In its reply brief, the EPA appears to unwittingly concede the point that its administrative burdens argument is unfounded, commenting on "the unique facts of this case" and stating that this "case presents a rare situation." Dkt. 97, at 3, 6.

*perform any act or duty under this chapter which is not discretionary* with the Administrator." 33 U.S.C. § 1365(a)(2) (emphasis added). Here, Plaintiffs have sued the EPA under Section 505(a)(2) for the EPA's failure to publish and promulgate replacement criteria for mercury water standards in Idaho as required by Section 303(c). Thus, as noted, the issue of whether there is discretion to perform those acts determines whether Plaintiffs may maintain this lawsuit against the EPA.

    *1. Nondiscretionary Duties*

    The EPA's duties to promptly publish and promulgate a new standard under Section 303(c) and under the circumstances of this case are nondiscretionary for numerous reasons. First, Congress used the word "shall," when referring to the duties of promptly publishing and promulgating the new standard in both paragraphs (3) and (4) of Section 303(c). 33 U.S.C. § 1313(c)(3)–(4). And the accompanying regulation uses similar mandatory language: "If the State does not adopt the changes specified by the [EPA] within 90 days after notification of the [EPA's] disapproval, the Administrator *shall promptly propose and promulgate such standard*." 40 C.F.R. § 131.22(a) (emphasis added). Though not dispositive of the issue, *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) ("[T]he use of 'shall' is not conclusive."), this is a strong starting point that the duty is nondiscretionary because the word "shall" generally imposes a mandatory duty. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (noting that "shall" is "mandatory language" that presumptively "connotes a requirement") (collecting cases)); *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989) (recognizing that by using

MEMORANDUM DECISION AND ORDER - 25

"shall," "Congress could not have chosen stronger words to express its intent" to impose a mandatory requirement); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (recognizing that "'shall[]' . . . normally creates an obligation impervious to judicial discretion").

Second, the scheme of the statute demonstrates that these duties are nondiscretionary. A holistic reading of Section 303(c), as summarized above, shows that at every turn the duties are nondiscretionary. The States must review the standards; the States must submit revised or new standards to the EPA's review; the EPA must review and approve or disapprove the standards; and the EPA must publish and promulgate standards, if the States do not do so. The duty to promptly publish and promulgate a standard does not appear to be an exception in this mandatory statutory scheme. Plainly put, when the Court reads Section 303(c), it sees nothing that indicates Congress intended to carve out such a limited exception when it comes to the EPA's duties to promptly publish and promulgate under Section 303(c)(4). Indeed, Congress could have used the word "may" if it wished to do so, but it did not.

Relatedly, the repeated use of the word "shall" in Section 303 underscores the nondiscretionary nature of the duties to promptly publish and promulgate a new standard. *See Maine Community Health Options*, 140 S. Ct. at 1320–21 (explaining that Congress's recurring use of "shall" in the relevant provision and adjacent provisions "underscore[d] its mandatory nature"). Here, Section 303 is rife with mandatory language. In subsection (c), Congress used "shall" 15 times, and "shall" appears 55 times in total in Section 303.

MEMORANDUM DECISION AND ORDER - 26

*See* 33 U.S.C. § 1313.

Third, not requiring the EPA to act in this situation would undermine the key purposes of the CWA, as already discussed. Again, to hold the EPA's duties as discretionary "would allow the agency's inaction to leave old standards or no standards in place, thereby defeating the CWA's purpose of restoring and maintaining 'the chemical, physical, and biological integrity of the Nation's waters.'" *Nw. Envt'l Advocs.*, 268 F. Supp 2d at 1261 (quoting 33 U.S.C. § 1251(a)).

Fourth, the caselaw supports viewing these duties as nondiscretionary. The Ninth Circuit has addressed the issue and held that the EPA's duties to publish and promulgate new standards under these circumstances are nondiscretionary:

> Plaintiffs argued Section 303(c) of the Clean Water Act imposes a mandatory duty upon the EPA to promptly promulgate water quality regulations if the state fails to do so within the 90 day period specified by Section 303(c)(3). The plain language of Section 303(c) supports plaintiffs' view. Section 303(c)(3) uses mandatory language, stating "the Administrator *shall* promulgate such standard pursuant to [Section 303(c)(4) ]." The same mandatory language appears in Section 303(c)(4): "The Administrator [of the EPA] *shall* promptly prepare and publish proposed regulations setting forth a revised or new water quality standard" if a state fails to adopt regulations within the specified period. There is no case law suggesting Section 303(c) leaves the Administrator any discretion to deviate from this apparently mandatory course.
>
> *Idaho Conservation League Inc. v. Russell*, 946 F. 2d 717, 720 (9th Cir. 1991)

(cleaned up). Although the issue before the *Russell* court was whether the plaintiffs were entitled to attorney's fees as the prevailing party, the court's language demonstrates that it

viewed the Section 303(c) duties as nondiscretionary. *See id.* at 719–20.[6] Therefore, the Ninth Circuit's view supports maintaining this lawsuit.

Other courts have issued highly persuasive opinions that are in accord with the Ninth Circuit's view. *Nw. Envt'l Advocs.*, 268 F. Supp. 2d at 1261 (holding that under Section 303(c)(4) "a state's failure to submit revisions in a timely fashion triggers EPA's nondiscretionary duty to act"); *Browner*, 968 F. Supp. at 549 ("By the plain language of the statute, and under the cited authorities, the EPA's duty under § [303](c)(4)(A) is mandatory."). *Raymond Proffitt Found.*, 930 F. Supp. at 1096–98 (E.D. Pa. 1996). The Court has read these opinions and adopts their reasoning on this issue.[7]

In short, the Court concludes that the EPA's Section 303(c)(4) duties to promptly publish and promulgate a new water standard for mercury in Idaho under the circumstances of this case are nondiscretionary. Therefore, the EPA is not entitled to sovereign immunity.

Notwithstanding these points, the EPA insists that there is discretion to publish and promulgate the new standard, thereby making it immune from this suit. The EPA makes several arguments to this end. None of its arguments are persuasive.

### 2.   *Confused Issue of Discretion*

---

[6] The EPA argues that, because the *Russell* court explicitly acknowledged that the "EPA [did] not seriously contest this analysis" and because the legal issues were different in *Russell* than the ones presented in this case, the quoted language is not binding authority. Dkt. 87-1, at 22–23 (quoting *Russell*, 946 F. 2d at 720). That may be so, but regardless of whether the language is binding or persuasive from a technical standpoint, this Court gives great credence to what the Ninth Circuit has said, especially when it has spoken so clearly on the very issue this Court is deciding.

[7] Of course, there have been courts which have held to the contrary: that is, the EPA's duties to promptly publish and promulgate a new standard is discretionary. The Court has read those cited cases as well, but they are unpersuasive for the reasons explained below.

To begin, the EPA confuses the question of discretion under the CWA. Invoking the date-certain rule (which the Court will address in one moment), the EPA argues that "where the statutory language of the relevant CWA provision leaves EPA at least some discretion in determining *when* to perform an act or duty, a citizen suit cannot proceed." Dkt. 87-1, at 15 (cleaned up). Similarly, the EPA asserts, "Because Congress in Section 303(c)(4) gave EPA discretion *as to the timing* of promulgating new water quality standards, Plaintiffs' claim falls outside of the limited waiver of sovereign immunity in the citizen suit provision." Dkt. 97, at 9 (emphasis added). Admittedly, the timetable for the EPA to act here does involve *some* limited discretion because Section 303(c)(4) requires the EPA to act "promptly" in publishing and promulgating a water quality standard instead of by a certain date or in a certain timeframe.

However, this point is unavailing because it is not the correct question of discretion under the CWA, nor does the EPA's argument receive support from the CWA. The question of discretion under the CWA is not one of timing; rather, it is one of discretion over whether "*to perform* any act or duty under this chapter which is not discretionary." 33 U.S.C. § 1365(a)(2) (emphasis added). In other words, the issue is not whether the EPA has some discretion as to *when* it acts; the issue is whether the EPA has discretion *to act*. And, as explained, the CWA does not leave the act or duty of publishing and promulgating a water quality standard under these circumstances to the EPA's discretion. The EPA must do so. Therefore, the EPA's argument attempts to incorrectly shift the issue from discretion over acting to discretion over timing.

### 3.  The Date-Certain Rule

Beyond this important distinction, the date-certain rule does not apply in this context of the CWA, which dooms the EPA's other arguments. The date-certain rule was developed by the D.C. Circuit in interpreting the pre-1990 Clean Air Act. *Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987). The rule is that "where timeliness is at issue, statutory provisions which do not set bright-line deadlines fall outside the reach of a citizen's suit." *Defenders of Wildlife v. Browner*, 888 F. Supp. 1005, 1008 (D. Ariz. 1995) (first citing *NRDC v. Thomas*, 885 F.2d 1067, 1075 (2d Cir. 1989); and then citing *Sierra Club*, 828 F.2d at 790 & n. 58).

The Court disagrees that this rule applies to the Section 505(a)(2) when applied to Section 303(c). For one thing, the date-certain rule has no support in the text of the CWA. Indeed, at no point does the CWA mention that discretion depends on a certain timetable or date to act. For another thing, the date-certain rule arose from the Clean Air Act's statutory scheme, which is different in a significant way from the CWA's: The date-certain rule "was developed to resolve an issue under the bifurcated jurisdictional scheme of the [pre-1990] Clean Air Act, and there is no analogous problem under the Clean Water Act." *Raymond Proffitt*, 930 F. Supp. at 1098. "The *Sierra Club* court fashioned its rule as part of an attempt to distinguish between the two court-bound avenues by which a citizen may travel to file a suit alleging unreasonable delay under the Clean Air Act. There is no reason to transport the *Sierra Club* rule into the much different context of a citizen's suit claim alleging violation" of a duty under Section 303(c). *Id.* at 1100. Additionally, in this case,

there is no dispute as to the timeliness of the EPA's actions because the Court easily concludes that the EPA failed to act promptly in publishing and promulgating a standard.[8] Finally, if the EPA's own view of its Section 303(c) duties, as expressed in its June 3, 2019 memorandum, were applied to the facts of this case, there would be a date certain for the EPA to act. U.S. Envt'l Protection Agency, *supra*, at 4 & n.4 ("By incorporating a 90-day timeline to propose a federal water quality standard, the EPA will have a total of 270 days from the time it disapproves a state or tribal standard to the time it must issue a final federal standard.").

These points also dispose of the EPA's argument that the similarities between the Clean Air Act's citizen-suit provision and the CWA's means they should be interpreted with the same date-certain rule. *Compare* 33 U.S.C. § 1365(a)(2), *with* 42 U.S.C. § 7604(a)(2). At first glance, this argument may seem compelling. Indeed, the Ninth Circuit in *Kennecott Copper Corp. v. Costle*, adopted the date-certain approach for the Clean Air Act's citizen-suit provision because "Congress recognized the potential for disruption of the administrative process inherent in a broad grant of jurisdiction to hear all cases involving the alleged failure of the Administrator to take actions authorized by" the Clean Air Act. 572 F.2d 1349, 1353 (9th Cir. 1978). But, again, the two Acts are meaningfully different. And the Ninth Circuit has not incorporated the date-certain rule into the CWA in the context at hand. To the contrary of the date-certain rule applying, the Ninth Circuit's general rule is that a certain date of action is not required to find a statutory duty

---

[8] Moreover, if the EPA's own view, as expressed in the June 3, 2019 memorandum, were applied to the facts of this case, there would be a date certain for the EPA to act.

nondiscretionary. *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1138, 1140 (9th Cir. 2020) ("hav[ing] no trouble concluding that a writ of mandamus [was] . . . warranted" although Congress "supplied no specific timetable" for action other than the APA's general requirement that it occur "within a reasonable time" (quoting 5 U.S.C. § 555(b)); *Columbia Riverkeeper*, 944 F.3d at 1208 (holding that even where the CWA was "silent as to what duties the EPA has when a state simply fails to submit a TMDL altogether," the EPA had a nondiscretionary duty to act); *In re Cmty. Voice*, 878 F.3d 779, 782–84 (9th Cir. 2017) (holding that the EPA's duty to revise certain standards was mandatory, even absent a clear deadline for action); *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813–15 (9th Cir. 2015) (finding the EPA delay unreasonable despite having previously concluded their timeline was discretionary); *see also Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 63 n.1 (2004) (same rule). Moreover, this Court believes that incorporating the date-certain rule in this context would be inappropriate. If these duties were not mandatory, the explicit purposes of the CWA would be undermined because water quality standards would remain either absent or stale.

### 4.  Unconvincing Caselaw

In arguing for its position, the EPA cites several cases—none of which convince the Court to change its conclusion. First, none of the cited cases are binding. Second, they all incorporated the D.C. Circuit's date-certain rule, which the Court holds does not apply in this context of the CWA. And, lastly, they all have further important differences.

For example, as is true about many of the cases the EPA cites, *Zen-Noh Grain Corp.*

*v. Jackson*, is wholly distinguishable because it dealt with the Clean Air Act's citizen-suit provision, not the CWA's. 943 F. Supp. 2d 657, 659 (E.D. La. 2013) ("This case arises under Clean Air Act . . . ."). Moreover, if anything, *Zen-Noh Grain Corp.* hurts the EPA's position. In a footnote, the court distinguished a case that held that the date-certain rule doesn't apply to the CWA's citizen-suit provision—*Raymond Proffitt*—by acknowledging a meaningful difference between the two provisions: "Importantly, the [CWA] does not have the same venue distinctions between unreasonable delay cases and nondiscretionary duty cases." *Id.* at 663 n.5. Thus, *Zen-Noh Grain Corp.* does not undermine the Court's conclusion; it offers further support to it.

And, although in *Cronin v. Browner* the court applied the date-certain rule to the CWA, the court was dealing with Section 316, not Section 303(c). 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995). More importantly, the court held that the references in Section 316 to Sections 301 and 306 ultimately made the acts nondiscretionary. Therefore, the ultimate holding that the duties were nondiscretionary is favorable to Plaintiffs' position because it makes even more of the duties in the CWA nondiscretionary. *See id.* And, again, the Court disagrees with the initial premise that the date-certain rule applies to the CWA here, making the case unpersuasive.

The EPA also cites *Defenders of Wildlife v. Browner*, 888 F. Supp. 1005 (D. Ariz. 1995). In short, this Court respectfully thinks that such case was wrongly decided. First, it was premised on the date-certain rule, which the Court determines does not apply to the CWA in this context for the reasons stated. Second, in doing so, the court relied on

MEMORANDUM DECISION AND ORDER - 33

*Kennecott Copper Corp.*, which again dealt with the Clean Air Act, not the CWA. Third, the court reasoned that the duty to promptly publish and promulgate "is not a categorical mandate from Congress that deprives EPA of *all discretion over timing* for preparing and publishing proposed water quality regulations for Arizona." *Id.* at 1008 (emphasis added). To reiterate, this Court deems this type of discretion to be the incorrect question of discretion under the CWA, focused wrongly on discretion over timing rather than discretion regarding whether to act. *See* 33 U.S.C. § 1365(a)(2). Therefore, this Court declines to follow its fellow Ninth Circuit court, opting to agree with its other Ninth Circuit courts instead. *See Nw. Envt'l Advocs.*, 268 F. Supp 2d at 1261; *Idaho Conservation League*, 968 F. Supp. at 549; *see also Raymond Proffitt Found.*, 930 F. Supp. at 1098 (providing three reasons not to follow the same case).

Consequently, the caselaw upon which the EPA relies is unable to dissuade the Court from viewing the EPA's Section 303(c) duties to publish and promulgate as nondiscretionary.

### 5. *Inapplicable Canons of Construction*

The EPA also suggests that two canons of construction apply to aid the Court in interpreting the CWA. The Court disagrees.

First, the EPA points out that Congress used timeframes in the States' required triennial review, in the EPA's required 60- or 90-day reviews, and in the 90-day timeframe for the EPA to promulgate final standards, but Congress did not use one for publishing. Instead, Congress used the word "promptly." The EPA then claims that, under the doctrine

MEMORANDUM DECISION AND ORDER - 34

of *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others), Congress knew how to impose a deadline when it meant to and when it meant to leave EPA with discretion over the timing of a duty. But this argument necessarily depends on the date-certain rationale applying in the first place and Congress assuming that it did when it enacted the CWA. Both assumptions are incorrect. Therefore, this argument is unconvincing.

Second, the EPA asserts that "the language 'shall promptly' is ambiguous as whether it creates a non-discretionary duty," and, therefore, it is entitled to a favorable statutory construction. Dkt. 87-1, at 25–26. "A waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign . . . ." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("Any ambiguities in the statutory language are to be construed in favor of immunity"). However, the EPA notably does not offer differing plausible interpretations of the language "shall promptly" that would make it ambiguous. Because the Court does not find the language to be ambiguous, it need not and does not adopt a construction favorable to the EPA. Reading those words plainly, they impose a nondiscretionary duty on the EPA to act in accordance with them.

### 6.  Conclusion

Due to the text, scheme, and polices of the CWA, as well as the caselaw on this issue, the Court concludes that the relevant duties under Section 303(c)(4)—promptly publishing and promulgating water quality standards—are nondiscretionary. Accordingly,

the EPA is not entitled to have this case dismissed based on sovereign immunity because Congress waived its immunity through the CWA's citizen-suit provision (Section 505(a)(2)).

## V. CONCLUSION

In sum, the Court holds that the EPA violated its nondiscretionary duties under Section 303(c) of the CWA to promptly publish and promulgate a mercury water quality standard for Idaho. The Court rejects the EPA's arguments to the contrary. Now that the EPA's liability has been established, the Court will allow the parties to brief the issue of appropriate relief per the parties' request in their briefs and at the hearing. *See, e.g.*, Dkt. 86, at 19.

## VI. ORDER

IT IS HEREBY ORDERED:

1. Plaintiffs' Partial Motion for Summary Judgment (Dkt. 85) is **GRANTED**.

2. The EPA's Partial Motion for Summary Judgment (Dkt. 87) is **DENIED**.

3. Plaintiffs' Motion for Leave to File Sur-Reply (Dkt. 102) is **GRANTED**.

4. The parties must file briefs regarding appropriate relief. Plaintiffs must file their motion and brief within twenty-one days of this Order. The briefing thereafter will proceed on the Court's typical briefing schedule.

DATED: July 19, 2021

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 36